**SEALED**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA and ) STATE OF TEXAS ) EX REL. BARBARA URICK ) ) Plaintiffs, ) ) v. ) ) VITAS HME SOLUTIONS, INC., ) VITAS HEALTHCARE OF TEXAS, L.P., ) VITAS HOSPICE SERVICES, L.L.C., ) VITAS HEALTHCARE CORPORATION, ) JUSTO CISNEROS, M.D., ) ANTONIO CAVASOS, M.D., ) SALLY SCHWENCKE, R.N., ) DIANE ANEST, R.N., and ) EDITH REED, R.N. ) ) Defendants ) | C.A. No. **SA08CA0663** COMPLAINT **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** and **TEX. HUM. RES. CODE ANN. § 36.102** **DO NOT PLACE IN PRESS BOX DO NOT ENTER IN PACER** |

Comes now the Plaintiffs, and for its action, states:

## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Texas arising out of false claims presented by or caused to be presented by Defendants under the Federal Medicare program and the joint Federal-State Medicaid program in violation of Title 31 U.S.C. §§ 3729, *et seq.,* popularly known as the FALSE CLAIMS ACT ("FCA"), and in violation of TEX. HUM. RES. CODE ANN. §§ 36.001-.132, the TEXAS MEDICAID FRAUD PREVENTION ACT ("TMFPA").

2.      Defendants directly and/or through conspiracy with other Defendants violated the FCA and TMFPA by submitting or causing to be submitted to the Medicare and Medicaid programs false claims involving hospice services for patients who were not

eligible for such care, medical supplies that were not reasonable or medically necessary, providing hospice services before performing prerequisites to payment that Medicare and Medicaid require, and backdating of the termination of hospice status to avoid payment of costs Defendant Hospice is legally required to pay.

3.      Defendants participate in the Medicare and Medicaid programs in the State of Texas, have provided hospice services to persons covered by the Medicare and Medicaid programs, and have billed the Medicare and Medicaid programs for the services and materials provided to persons covered by those programs.

4.      On June 30, 2008, counsel for Barbara Urick ("Relator") met with Assistant United States Attorneys Harold Brown and Winstanley Luke and voluntarily provided the information on which the allegations herein are based, in compliance with 31 U.S.C. § 3730(e)(iv)(B).

5.      On June 30, 2008, counsel for Relator met with Assistant Attorney General Mark Coffee of the Office of Attorney General of Texas, and voluntarily provided the information on which the allegations herein are based. in compliance with TEX. HUM. RES. CODE ANN. § 36.113(b).

## JURISDICTION AND VENUE

6.      Title 31 U.S.C. § 3732(a) provides that United States District Courts shall have jurisdiction over actions brought under the FCA. Section 3732(b) of the same title provides that "The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730" of the FCA. The TMFPA counts in this action arise from the same transactions or

2

occurrences as the counts brought under § 3730 of the FCA.

7.      Section 3732(a) of the FCA provides that: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The acts complained herein occurred within this judicial district and all the Defendants transact business in this district.

8.      Under the FCA and the TMFPA, this complaint is to be filed in camera and remain under seal for at least sixty (60) days under the FCA and under seal for at least one hundred and eighty (180) days under TMFPA. The Complaint shall not be served on Defendants until the Court so orders. The United States Government may elect to intervene with the action within sixty (60) days after it receives the Complaint, material evidence and information from Relator, and the State of Texas may do the same within one hundred eighty (180) days.

## PARTIES TO THE ACTION

9.      Relator is a resident of Bexar County, Texas and an employee of Defendant Hospice. Relator brings this action on behalf of the United States and the State of Texas. Relator is a registered nurse ("RN") with a Bachelor of Science in Nursing and Certification in Critical Care Nursing. Relator has over thirty-four (34) years of experience in medical services and has been an employee of Defendant Hospice in San Antonio since January 2006 as a triage field nurse. Relator brings this action based on her direct, independent and personal knowledge and also on information and belief.

10.      Relator is an original source of information to the United States and the State of Texas. Relator has direct and independent knowledge of the information on

3

which the allegations herein are based and has voluntarily provided the information to the United States Government and the State of Texas before filing an action under the FCA and the TMFPA which is based on the information.

11.     Defendants VITAS HME Solutions, Inc., VITAS Healthcare of Texas, L.P., VITAS Hospice Services, L.L.C., and VITAS Healthcare Corporation own and operate the hospice services program in which Relator is employed as a RN and which is located at 5430 Fredericksburg Rd. Ste. 200, in San Antonio, Bexar County, Texas. These defendants are collectively referred to as "Defendant Hospice." The ultimate parent company and owner of Defendant Hospice is Chemed Corporation, a public corporation headquartered in Cincinnati, Ohio and existing under the laws of the State of Delaware. The direct parent companies of the entities comprising Defendant Hospice are Comfort Care Holdings Co., VITAS Care Solutions, Inc., VITAS Healthcare Corporation, Hospice Care Inc., and VITAS Holdings Corporation, all of which are directly or indirectly owned by Chemed Corporation. Defendant Hospice and its numerous affiliates operate forty-two (42) hospice programs in sixteen (16) states. More than ninety percent (90%) of Defendant Hospice's net patient service revenue consists of payments from Medicare and Medicaid.

12.     Defendant Justo Cisneros, M.D. ("Defendant Cisneros") is a physician licensed to practice in the State of Texas since February 1982, a resident of Bexar County, Texas and is the medical director of Defendant Hospice in San Antonio.

13.     Defendant Antonio Cavasos, M.D. ("Defendant Cavasos") is a physician licensed to practice in the State of Texas since August 1965, is a resident of Bexar County, Texas and a triage physician assigned to evaluate and supervise hospice patients

4

for Defendant Hospice.

14.     Defendant Sally Schwenk, R.N. ("Defendant Schwenk") is a RN licensed to practice in the State of Texas, a resident of Bexar County, Texas, and employed by Defendant Hospice as the Director of Nursing.

15.     Defendant Diane Anest, R.N. ("Defendant Anest") is a RN licensed to practice in the State of Texas since July 1996, a resident of Bexar County, Texas, and employed by Defendant Hospice as the Assistant Director of Nursing.

16.     Defendant Edith Reed, R.N. ("Defendant Reed") is a RN licensed to practice in the State of Texas since November 1998, a resident of Bexar County, Texas, and employed by Defendant Hospice in a supervisory capacity with the title of Team Manager.

## FALSE CLAIMS ACT

17.     Federal law prohibits making misrepresentations in order to obtain payment funds to which a party is not entitled. 31 U.S.C.A. §§ 3729 *et seq.*

18.     The FALSE CLAIMS ACT is the primary law on which the Federal government relies to recover losses caused by fraud. Avco Corp. v. Dept. of Justice, 884 F.2d 621, 622 (D.C. Cir. 1989). The FCA imposes civil liability for making a false claim for payment by the government:

> Any person who-
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]

....

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government....

31 U.S.C. § 3729(a). The FCA also permits private citizens to bring qui tam suits to enforce the FCA. Id. § 3730(b).

19.     The Supreme Court has stated that Congress intended that the FCA be broadly applied to protect government funds and property from fraudulent claims. U.S. v. Niefert-White Co., 390 U.S. 228 (1968).

## TEXAS MEDICAID FRAUD PREVENTION ACT

20.     While the FCA imposes civil liability for the presentation to the Federal Government of a false claim for payment, the TMFPA mirrors the FCA, imposing liability for presentation of false claims to the Medicaid program in the State of Texas.

21.     The TMFPA imposes civil liability where a person:

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

   (A) on an application for a contract, benefit, or payment under the Medicaid program; or

   (B) that is intended to be used to determine a person's eligibility for a benefit or payment under the Medicaid program;

(2) knowingly or intentionally conceals or fails to disclose an event:

   (A) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

      (i)  the person; or

      (ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

6

(B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

...

(9) knowingly or intentionally enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent

...

TEX. HUM. RES. CODE ANN. § 36.002. The TMFPA permits private persons to bring an action on behalf of the State of Texas. Id. § 36.101.

## MEDICARE & MEDICAID

22.     Medicare is a social insurance program administered by the United States government, providing health insurance coverage to people who are either age sixty-five (65) and over or who meet other special criteria. Medicare was created in 1965 through Title XVIII of the Social Security Act. Hospice care services are provided under Part A of Medicare for patients generally eligible for Medicare benefits.

23.     Medicaid is a jointly funded State and Federal health insurance program primarily for eligible low-income individuals, children, seniors, and people with disabilities. Medicaid was created in 1965 through Title XIX of the Social Security Act. Hospice care services are provided under Medicaid for patients generally eligible for Medicaid.

## MEDICARE AND MEDICAID HOSPICE SERVICES

24.     Hospice services are health care services provided for the palliation of pain and other medical management in the context of terminal illness, as distinct from care provided for cure of or rehabilitation from illness or injury. Medicare and Medicaid establish four categories of hospice services, depending on the type and level of care

7

necessary.

(1) <u>Routine Home Care</u> ("RHC"):  RHC services are hospice services a terminally ill patient receives at home or in a nursing facility that are not CHC services.

(2) <u>Continuous Home Care</u> ("CHC"):  CHC services are hospice services a patient receives at home or in a nursing facility consisting predominately of nursing care provided by either a RN, licensed practical nurse ("LPN"), or licensed vocational nurse ("LVN").  CHC is only furnished during brief periods of crisis and only as necessary to maintain a terminally ill patient at home.  The term "crisis care" is used interchangeably with the term "CHC" in the health care industry.

(3) <u>Inpatient Respite Care</u> ("IRC"):  IRC services are short-term inpatient hospice services that provide relief to a patient's caregivers.

(4) <u>General Inpatient Care</u> ("GIC"):  GIC services are hospice services a patient receives in an inpatient facility for pain control and symptom management which cannot be managed in other settings.

25.    <u>Medical Necessity</u>.  In the case of hospice care, both Medicare and Medicaid pay only for those items or services which are "reasonable and necessary for the palliation or management of terminal illness."[1]

26.    In medicine, "performance status" is an attempt to quantify a patient's general wellbeing.  The health care industry uses performance status scores to determine,

---

[1] 42 U.S.C. § 1395y(a)(1)(c) (Medicare); 42 C.F.R. 418.96 (Medicare); 40 TEX. ADMIN. CODE § 30.50 (Medicaid).

among other things, whether an appropriate level of care is medically necessary, including the intensity of palliative care that a patient requires as a result of terminal illness. Defendant Hospice uses the "Karnofsky scale" as a measure of performance status. This performance status scale runs from 100 to 0, in which 100 is "perfect" health and 0 is death. The following Karnofsky scale describes performamce status points at intervals of ten:

| | |
|---|---|
| 100% ............. | normal, no complaints, no signs of disease |
| 90%............... | capable of normal activity, few symptoms or signs of disease |
| 80%............... | normal activity with some difficulty, some symptoms or signs |
| 70%............... | caring for self, not capable of normal activity or work |
| 60%............... | requiring some help, can take care of most personal requirements |
| 50%............... | requires help often, requires frequent medical care |
| 40%............... | disabled, requires special care and help |
| 30%............... | severely disabled, hospital admission indicated but no risk of death |
| 20%............... | very ill, urgently requiring admission, requires supportive measures or treatment |
| 10%............... | moribund, rapidly progressive fatal disease processes |
| 0%................ | death |

27.     Payment for hospice services may only be made if the provider meets certain requirements. Both Medicare and Medicaid beneficiaries wishing to receive hospice care services must: (1) be certified as being terminally ill, (2) have a plan of care established before services are provided, and (3) receive services consistent with the plan of care.[2]

28.     <u>Certification of Terminal Illness</u>.     A hospice must obtain written certification of a patient's terminal illness before it can legally submit a claim for payment of hospice services provided to the terminally ill patient. An individual is considered terminally ill if the medical prognosis is that the individual's life expectancy

---

[2] 42 C.F.R. §§ 418.20, .22, .58 (Medicare); MEDICARE BENEFIT POLICY MANUAL, Ch. 9 §§ 10, 40 [hereinafter POLICY MANUAL] (Medicare); 40 TEX. ADMIN. CODE § 30.50 (Medicaid).

is six months or less if the illness runs its normal course.[3]

29.     The written certification must include: (1) a statement that the patient's life expectancy is six months or less if the terminal illness runs its normal course, (2) specific clinical findings and other documentation supporting this prognosis, and (3) the signature of the physician.[4]

30.     Medicare and Medicaid authorize hospice services only for limited periods of time, termed "election periods."  For the initial election of hospice care, the hospice must receive written certification from the medical director of the hospice or the physician member of the hospice interdisciplinary group, and the patient's attending physician, if the patient has an attending physician.  After the initial election of hospice services ends, a patient must be recertified as being terminally ill for continuation of the hospice services.  These subsequent periods of hospice service only need to be certified by one physician, meaning that the medical director of the hospice, the physician member of the hospice interdisciplinary group, or the physician's attending physician can alone recertify the patient.[5]

31.     When a beneficiary's condition improves and he or she is no longer considered terminally ill, the hospice cannot recertify the patient for hospice services.[6]

32.     Initial Plan of Care ("IPOC").  An IPOC must be established before

---

[3] 42 C.F.R. § 418.22 (Medicare); POLICY MANUAL § 20 (Medicare); 40 TEX. ADMIN. CODE § 30.14 (Medicaid).
[4] 42 C.F.R. § 418.22 (Medicare); POLICY MANUAL § 20 (Medicare); 40 TEX. ADMIN. CODE § 30.14 (Medicaid).
[5] 42 C.F.R. § 418.22 (Medicare); POLICY MANUAL § 20 (Medicare); 40 TEX. ADMIN. CODE § 30.14 (Medicaid).
[6] 42 C.F.R. § 418.25 (Medicare); MEDICARE CLAIMS PROCESSING MANUAL, Ch. 11 § 20.2.1 [hereinafter CLAIMS MANUAL] (Medicare); 40 TEX. ADMIN. CODE §§ 30.10, .14 (Medicaid).

hospice services are provided.[7] The IPOC must include an assessment of the patient's needs and identification of the services planned for the patient, including the management of discomfort and symptoms relief. The assessment must include two members of an interdisciplinary group consisting of physicians, nurses, medical social workers, and counselors meeting or discussing over the phone the care of the patient before writing the IPOC. At least one of the members involved in developing the IPOC must be a nurse or a physician. At Defendant Hospice, a RN normally performs the assessment, so the assessment is referred to as a "nursing assessment." The identification of the necessary services must state in detail the scope and frequency of services needed to meet the patient's and family's needs, and it must be established on the same day as the individual's assessment if the day of assessment is to be a covered day of service. The attending physician or nurse practitioner and the medical director or physician designee must review the IPOC within two (2) calendar days following the assessment.[8]

33.    Medicare Election Periods for RHC Services. As discussed supra ¶ 30, the term "election period" refers to the time period during which a particular beneficiary's certification of eligibility for hospice care remains effective. A beneficiary may receive an unlimited number of election periods of RHC services. Under Medicare, the first and second elections of RHC services are each for a ninety (90) day period, with subsequent elections being for sixty (60) day periods.[9]

34.    Medicaid Election Periods for RHC Services. Medicaid provides for six

---

[7] CLAIMS MANUAL § 10 (Medicare); 40 TEX. ADMIN. CODE § 30.50 (Medicaid).
[8] 42 C.F.R. § 418.58 (Medicare); 40 TEX. ADMIN. CODE § 30.50 (Medicaid).
[9] 42 C.F.R. § 418.21 (Medicare); CLAIMS MANUAL § 10 (Medicare).

Case 4:13-cv-00563-BCW   Document 1   Filed 08/08/08   Page 11 of 56

month election periods for RHC.[10]

35. <u>CHC Services</u>. When RHC hospice services do not provide the level of care needed for a patient, a patient may qualify for CHC hospice services. CHC services provide for a higher level of care than RHC services, including at least eight (8) hours per day of skilled nursing services by a RN or LPN/LVN. This higher level of care is provided at a more expensive cost to Medicare and Medicaid.

36. *Medical Necessity for CHC Services*. Medicare and Medicaid reimburse for CHC services only during periods of crisis and only as necessary to maintain a terminally ill patient at home.[11] A "period of crisis" is "a period in which the individual requires continuous care to achieve palliation or management of acute medical symptoms."[12] Medicaid further defines a "crisis" as a "sudden paroxysmal intensification of symptoms that appropriate medical intervention and nursing services could reasonably be expected to ameliorate", and "nursing services" as those "nursing tasks that could not reasonably be delegated to family members or nurse aides."[13]

37. Medicaid allows for an initial election period of five consecutive days for reimbursement of CHC services. Additional days may only be allowed with approval from the Texas Department of Human Services.[14]

38. <u>Medicare Payment Rates</u>. The 2008 Medicare national payment rates and relevant revenue codes for hospice services are as follows:[15]

---

[10] 40 TEX. ADMIN. CODE § 30.12 (Medicaid).
[11] S.S.A., § 1861(dd)(1)(I).
[12] 42 C.F.R. § 418.204 (Medicare); POLICY MANUAL § 40.2.1 (Medicare); 40 TEX. ADMIN. CODE. § 30.54 (Medicaid).
[13] 40 TEX. ADMIN. CODE. § 30.54 (Medicaid).
[14] 40 TEX. ADMIN. CODE. § 30.54 (Medicaid).
[15] 42 C.F.R. § 418.306 (Medicare); CMS Pub 100-04 CLAIMS MANUAL, Update to the Hospice Payment

RHC (Revenue Code 0651) ...................................... $135.29 per day

CHC (Revenue Code 0652) ...................................... $788.86 per day/$32.87 per hour

IRC (Revenue Code 0655) ...................................... $147.12 per day

GIC (Revenue Code 0656) ...................................... $601.02 per day

39.   Medicaid Payment Rates.  The Medicaid payment rates and relevant billing codes for hospice services are as follows:[16]

| | |
|---|---|
| RHC (T0100/HCPC T2042/Service Code 1)............. | The Medicaid hospice program establishes and pays prospective per diem rates that are no lower than the Medicare hospice program rates. |
| CHC (T0200/HCPC T2043/Service Code 1) ............. | The Medicaid hospice program establishes and pays prospective per diem rates that are no lower than the Medicare hospice program rates. |
| IRC (T0300/HCPC T2044/Service Code 1)............... | The Medicaid hospice program establishes and pays prospective per diem rates that are no lower than the Medicare hospice program rates. |
| GIC (T0301/HCPC T2044/Service Code 1)............... | The Medicaid hospice program establishes and pays prospective per diem rates that are no lower than the Medicare hospice program rates. |

40.   No Retroactive Adjustments of Payment Rates. The hospice rates are prospective rates, meaning that no retroactive adjustments may generally be made.[17] Thus, a hospice receives a predetermined payment for each patient based on the type of hospice care a patient receives, as set forth supra ¶¶ 38-39.  A hospice will not receive

---

Rates (June 29, 2007) (Medicare); Memorandum from CMS on Correction to Annual Change in Medicaid Hospice Payment Rates (Sept. 25, 2007) (Medicare).

[16] TEXAS MEDICAID HOSPICE PROVIDER MANUAL §§ 5000, 5200 [hereinafter MEDICAID MANUAL] (Medicaid).

[17] 42 C.F.R. § 418.302 (Medicare); MEDICAID MANUAL § 5100 (Medicaid).

any additional reimbursements beyond the per diem rate, even in instances where the actual cost to the hospice of providing a patient's care exceeds these rates.

41. Once a hospice chooses to admit a Medicare beneficiary, it may not automatically or routinely discharge the beneficiary at its discretion, even if the care promises to be costly or inconvenient. The election of the hospice benefit is the beneficiary's choice rather than the hospice's choice, and the hospice cannot revoke the beneficiary's election.[18] However, the patient or a representative of the patient may revoke the election of hospice care at any time with a signed statement.[19] The revocation of election must include the date that the revocation is to be effective, and the "individual or representative may not designate an effective date earlier than the date that the revocation is made."[20]

42. For the duration of an election of hospice care, a Medicare beneficiary waives all rights to Medicare payments for any "Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition" except for services provided by hospices and by the beneficiary's attending physician.[21]

43. Once a patient has revoked the election of hospice care, the patient resumes Medicare coverage of benefits that had been waived during the hospice election.[22]

## FACTS OF THE CASE

44. As set forth below, Defendant Hospice and its agents fraudulently submitted claims for hospice services and supplies for patients that were not eligible for

---

[18] POLICY MANUAL § 20.2.1 (Medicare).
[19] 42 C.F.R. § 418.28(b)(1) (Medicare); 40 TEX. ADMIN. CODE.§ 30.18 (Medicaid).
[20] 42 C.F.R. § 418.28(b)(2) (Medicare); 40 TEX. ADMIN. CODE.§ 30.18 (Medicaid).
[21] 42 C.F.R. § 418.24(d) (Medicare).

14

such services and supplies, submitted claims for hospice services without first completing a legally sufficient IPOC as required by Medicare and Medicaid regulations, and fraudulently stated the time of termination of hospice services in order to avoid obligations Defendant Hospice was required to provide as a Medicare and Medicaid provider.

45.     Except where otherwise stated, to the best of Relator's knowledge, the fraudulent practices began at least ten (10) years prior when Vice President Keith Becker became the General Manager of the San Antonio branch of Defendant Hospice. On information and belief, Vice President Becker employs similar practices at each of the branch locations he now controls in the State of Texas, including San Antonio, Houston, Dallas, and Fort Worth.

### *Defendant Hospice*

46.     Relator's position as a triage nurse involves visiting, assessing, and treating patients who receive hospice services through Defendant Hospice.

47.     Defendant Hospice groups their employees into different interdisciplinary groups, referred to by Defendant Hospice as "teams." Defendant Hospice has approximately ten (10) different teams, each of which manages the care of ten (10) to fifteen (15) patients. A physician and a RN together head up a team. The lead RN of each team is known as the "team manager."

48.     Relator is not assigned to a particular team because Relator works during weekends only. The teams rotate weekend shifts, so that the team physician and team manager on call change each weekend. If Relator needs to contact a supervisor, she

---

[22] 42 C.F.R. § 418.28(c) (Medicare).

contacts the team physician or RN team manager on call for that weekend.

49.    Relator and other Defendant Hospice personnel must complete documentation on each patient that they visit. Moreover, after visiting a patient, Relator must call Defendant Hospice and give a verbal report on the patient. The teams meet once a week to review the written and verbal reports compiled by personnel and discuss the care of the patients.

### False Claims for CHC Services

50.    Defendants systematically provide CHC services to patients that are not experiencing a "period of crisis" and CHC is not required to maintain the patients at home. Thus, Defendant Hospice provides CHC to patients that do not meet the CHC guidelines, as set forth by Medicare and Medicaid.

51.    Defendant Hospice is the only hospice service in San Antonio, Texas that provides CHC care, and Defendant Hospice provides CHC services to approximately twenty-five (25) to thirty-five (35) patients each day.

52.    Many of Defendant Hospice's patients receiving RHC and CHC hospice services actually need only "custodial care." Custodial care is non-skilled care that helps a patient with activities of daily living, such as dressing and bathing. Medicare and Medicaid do not cover custodial care.

53.    Physicians for Defendant Hospice rarely, if ever, see the patients in person. Instead, they rely upon discussions with RNs and LPNs/LVNs for updates on the status of patients. Physicians for Defendant Hospice, including Defendants Cisneros and Cavasos, routinely refuse to take patients off of CHC or other hospice services that are not medically necessary, in cases where the physicians have never examined the patients,

16

and the RNs have evaluated and reported to the physicians the lack of need for the services. Relator has noticed that the only times in which she has been able to convince a physician for Defendant Hospice to remove a patient from CHC is when there is a waiting list for CHC services such that there is a new patient readily available to replace the patient being removed from CHC.

54. Information printouts are provided by the Defendant Hospice to their nurses, such as the Relator, on each patient for which the nurse provides care. These printouts show, among other information, whether the patient's billing is being paid by the patient, private insurance, Medicare, or Medicaid.

55. Over the past two years, Relator noticed and documented patient numbers, dates, and facts on patients she cared for that had either never satisfied the criteria for hospice services or had improved to the point that hospice services were no longer necessary, but were maintained as hospice patients of Defendant Hospice.

56. Relator has documented numerous cases where patients have received CHC services that were not medically necessary.

57. Over the last two years, Relator has alerted Vice-President Becker, Defendant Schwencke, and Defendant Anest to a number of patients who did not satisfy the criteria for CHC. When Relator alerted these company officials, they routinely responded by telling Relator, "You do not know all the facts . . . only the team managers do" or "leave the patient on CHC because we never take them off on the weekends".

58. On several occasions Relator informed the same company officials that Defendant Hospice's placement of patients requiring only custodial care into CHC care violated Medicare and Medicaid guidelines. One specific conversation took place in

approximately October 2007. When Relator confronted Vice-President Becker about the patients receiving CHC services that did not meet Medicare or Medicaid guidelines, Mr. Becker's response was, "Those are just the guidelines," implying that the programs allowed Defendant Hospice discretion to bill for services which do not comply.

59.     It is the standard policy of Defendant Hospice that CHC patients are never removed from CHC on the weekend, even when the team nurse is aware that the patient requires custodial care only. Defendant Hospice has had this policy in place at least since Relator began her employment in January 2006, and Defendant Hospice posts this policy on memorandums, and on information and belief, in policy manuals.

60.     Physicians of Defendant Hospice are responsible for certifying and recertifying the necessity of hospice services for the majority of patients served by Defendant Hospice. The physicians that have certified and/or continue to certify patients for CHC services are Defendants Cisneros and Cavasos and physicians Rosa Fuentes and Ann Burgardt.

61.     Defendant Cavazos was an employee of Defendant Hospice from approximately April 2007 to May 2008. The Relator knows of no patient in which Defendant Cavazos refused to certify CHC services, despite the fact that patient notes showed that certain of these patients actually required only custodial care. RNs for Defendant Hospice frequently informed Defendant Cavasos of the lack of need for CHC services with certain patients, and Defendant Cavasos rarely saw a patient face-to-face, where he could make a medical judgment that did not solely rely on the RN's assessments of patients and notes.

62.     Since Defendant Cavazos' departure, Dr. Fuentes and Dr. Burgardt have

been re-certifying patients for the continuance of CHC, although they rarely, if ever, see a patient. Relator has only once during her employment seen a physician's note that showed that Dr. Fuentes or Dr. Burgardt actually saw and performed a physical examination of a patient.

63. Relator has cared for many patients who received CHC services that were not medically necessary during her employment with Defendant Hospice. The following are examples of individual patients who received CHC services that were not medically necessary.

64. On or about March 16, 2008, Patient Number 00843850, an eighty-six (86) year old female, was placed on CHC because of a change in level of consciousness. When Relator visited the patient, Relator found her to be awake and alert, able to answer questions and follow commands. The patient lived in an assisted living facility where facility nurses gave all medications, and the patient notes reflect that during the CHC election periods in question Defendant Hospice's RNs provided custodial care only. In this case, the Hospice RN merely sat next to the patient, day in and day out, without providing any skilled care. The patient received twenty-four (24) hour CHC services, including LVNs for twelve (12) hours. The patient remained on CHC for at least forty-five (45) days. Although Relator informed Defendant Hospice via her written documentation and her verbal report that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, Defendant Hospice continued to provide CHC services to this patient. Defendant Hospice fraudulently submitted claims to Medicare for these services.

65. Defendant Hospice placed Patient Number 007466821, an eighty-nine (89)

year old male, on CHC because of agitation. However, the patient refused all anti-anxiety medications, and the patient notes reflect that during the CHC election periods only custodial care was given. The notes reflect that the principal services for the patient included assistance with bathing and reading the Bible to the patient. The patient remained on CHC for forty-five (45) days. Patient notes showed that the patient's wife was also a patient of Defendant Hospice and had herself remained on CHC for sixty (60) days, even though only custodial care services were necessary. At one point when both the patient and his wife were on CHC, Defendant Hospice was sending two RNs/LPNs/LVNs to the patient's house, even though neither the patient nor his wife actually required skilled nursing care. After Relator discovered this abuse, she called the team manager on call and reported that the patient and his wife did not require CHC services. Despite the fact that Relator informed Defendant Hospice of the lack of need for these services, Defendant Hospice continued to provide CHC services to the patient for approximately three (3) more weeks. Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient and his wife.

66. On or about February 28, 2008, Patient Number 00788556, an eighty-six (86) year old male, was placed on CHC because of increased confusion and shortness of breath. Relator visited the patient on March 2, 2008. The patient admitted to having suffered from shortness of breath "for a long time because of my lung disease." The patient had twenty-four (24) respirations per minute, was able to feed himself and transfer himself out of bed without assistance. Patient notes reflect that only custodial care was given. Both Relator and RN Amy Cooley, a former employee of Defendant Hospice, tried repeatedly to remove the patient from CHC by informing Defendant Cavasos that

the patient did not require CHC care. However, Defendant Cavasos refused to remove the patient from CHC. Approximately the middle of May 2008, RN Cooley finally succeeded in removing the patient from CHC by contacting the patient's attending physician, who agreed that the patient did not require CHC. However, Defendant Hospice returned the patient to CHC on or about May 20, 2008 for approximately one week. The patient remains on service, and was recently returned again to CHC in early July 2008. Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient.

67.     On or about July 12, 2007, Patient Number 00806746, an eighty-two (82) year old male, was placed on CHC for having a decreased level of consciousness and increased shortness of breath. Relator visited the patient on July 17, 2007. The patient admitted to suffering from shortness of breath "for years", denied any pain, was fully mobile with the assistance of a walker, and was able to perform standard activities of daily living, such as bathing himself. Relator called and spoke with the team manager on call and informed the team manger that CHC was not necessary for this patient. However, Defendant Hospice kept the patient on CHC for thirty (30) days until the patient's family moved him out of San Antonio. Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient.

68.     Relator repeatedly cared for patients on whom Defendant Hospice, upon information and belief, "forced" CHC care. This information is described as follows and

the belief is based on the observation of numerous patients who were treated similarly. Approximately December 2006, Patient Number 00765807, an eighty-nine year (89) old male, was placed on RHC. The patient began receiving CHC services on or about November 17, 2007 for a decreased level of consciousness. Relator visited the patient on November 18, 2007. During her visit with the patient, the family of the patient complained to Relator that Defendant Hospice had "forced crisis care" on the patient. The family told Relator that they felt that the extra staff with CHC had increased the patient's restlessness and stress, and the family informed Relator that they had actually sent RNs of Defendant Hospice away. Defendant Hospice removed the patient from CHC services on or about November 18, 2007 per the family's request. However, Defendant Hospice returned the patient to CHC services again on or about February 17, 2008 through March 23, 2008, only to be removed again per the request of the patient and his family. Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient.

69. On or about May 26, 2008, Patient Number 00875958, a sixty-one (61) year old female, was placed on CHC. The patient's family would not allow employees of Defendant Hospice to see the patient unless the family had to leave the house to run an errand. Even when this occurred, the patient only required custodial care. Nurses spent entire shifts relegated to the kitchen of the house, unable to enter the room in which the patient rested. In fact, there were only a few occasions in which Defendant Hospice personnel even saw the patient. Relator was sent to the patient's house approximately nineteen (19) days after the patient was placed on CHC. Relator reported the

circumstances to team manager Sheri Knecht, and they both agreed that the patient should be taken off of CHC. However, despite their assessment, the patient remained on CHC until the patient passed away on June 30, 2008. Defendant Hospice fraudulently submitted claims to Medicaid for the CHC services provided to this patient.

70. On or about January 7, 2007, Relator cared for Patient Number 00623547, an eighty-one (81) year old female, who was placed on CHC because of increased respiratory distress, increased weakness, and change in level of consciousness. Relator visited the patient on January 21, 2007. Relator took the patient's vitals, which showed she had twenty-two (22) respirations per minute, which is normal, with even and unlabored breathing. The patient was able to get up to her bedside commode and move to her recliner without assistance. Patient notes reflect that only custodial care was given. Relator informed Defendant Reed that the patient no longer satisfied the criteria for CHC. Defendant Reed advised Relator to leave the patient on CHC "over the weekend until the primary nurse for the patient could reevaluate" the patient. It was not until almost one (1) week later, on January 23, 2007, that the patient was discharged from CHC. Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient.

71. On or about March 9, 2008, Relator visited Patient Number 00855681, an eighty-seven (87) year old female that lived in an assisted living facility and had private caregivers. The patient required purely custodial care, and personnel of Defendant Hospice could do nothing for the patient that was not already provided by the patient's private caregivers. Even though skilled nursing services were not medically necessary

and the patient was not experiencing a period of crisis, Defendant Hospice fraudulently submitted claims to Medicare for the CHC services provided to this patient.

72.     On or about June 7, 2008, Relator cared for a patient that had been on CHC since approximately May 19, 2008. Relator saw in this patient's chart two notes from Dr. Fuentes, asking that Defendant Hospice remove the patient from CHC. However, Defendant Hospice had never removed the patient from CHC. The first note from Dr. Fuentes was on May 27, 2008. The patient's records show that since May 23, 2008, the patient had normal vital signs, her pain was being properly managed, and the patient had no problems with shortness of breath. On the day that Relator cared for this patient, Relator contacted the team physician on call and successfully obtained the physician's approval to remove this patient from CHC.

73.     Defendant Hospice maintains a policy that Relator and other RNs must keep detailed notes of their visits with patients. Many of these notes reflect that hospice services were never necessary or were no longer necessary. In approximately April 2008, other RNs employed by Defendant Hospice told Relator that Defendant Reed was changing the notes of the RNs. Defendant Reed changed or deleted entries which reflected poorly upon Defendant Hospice or which showed that Defendant Hospice was providing medically unnecessary services. After discovering that Defendant Reed was changing records, Relator and other RNs began making and keeping copies of the records when making new entries.

74.     Relator and other RNs of Defendant Hospice have arrived at homes of patients placed on CHC and been unable to provide services because the patients are at church, playing Bingo, or at the beauty parlor.

75. On information and belief, Defendant Hospice uses full-time CHC services to entice hospice patients and their families to enroll with Defendant Hospice, rather than those of Defendant Hospice's competitors. The source of this information is the Relator, and the belief is based on Relator's experience when she first began employment with Defendant Hospice and accompanied Senior Admissions Nurse Barbara Fuqua to a hospice admissions assessment and enrollment meeting. Relator observed RN Fuqua "selling" Defendant Hospice services by specifically discussing CHC care. RN Fuqua explained to the family that CHC provided twenty-four (24) hour nursing care "at no charge" to the family. Upon questioning by Relator, Fuqua told Relator that all the admissions nurses discuss the CHC services because it "is something unique that we (Defendant Hospice) offer," referencing the fact that Defendant Hospice is the only hospice service in San Antonio that provides CHC services. The "pitch" is clearly designed to appeal to families who have been responsible for providing custodial care to their relative, thereby relieving them from this task.

76. Defendant Hospice also routinely enrolls patients in hospice care when they are only hours from passing away. When a patient is enrolled, Defendant Hospice is paid for the enrollment and if they are placed on hospice care right before their death, Defendant Hospice is paid for a day of services. Patients are routinely taking their last breaths when they are being signed onto hospice care.

77. Relator cared for such a patient on June 15, 2008. Relator was sent to provide CHC services and perform an IPOC on an elderly woman that had just suffered a cardiac arrest on June 13, 2008. Relator arrived at the patient's home at 1:55 p.m., and the patient passed away at 3:48 p.m. Relator returned to Defendant Hospice's office after

caring for the patient. Relator asked team leader RN Enomie Rosenthal as to whether Defendant Hospice would receive payment for the services Relator had provided that day, and RN Rosenthal informed Relator that, so long as Relator had performed an IPOC, "we're okay." Nurse Rosenthal told Relator that Defendant Hospice would still receive the "initiation fee" for the enrollment of the patient in hospice, as well as payment for the hospice services.

### False Claims for Hospice Services Generally

78.     Defendants systematically provide hospice services to patients that are not terminally ill, as defined by Medicare and Medicaid, or are terminally ill, but only require custodial care and are not in need of hospice services.   The following are examples of individual patients that received hospice services that were not medically necessary.

79.     Patient Number 00651468, a woman approximately forty-four years of age, has received RHC services for at least four (4) years, despite the fact that she is not terminally ill. Defendant Cisneros has been repeatedly recertifying this patient for RHC care, though the patient's primary diagnoses are asthma and obesity. Defendant Hospice has assigned this patient new patient numbers over the years. Upon information and belief, Defendant Hospice reassigned this patient new patient numbers so that Medicare could not easily recognize the recurring services for the patient. The source of this information is Relator and medical records the Relator has seen. The belief is based on the fact that Relator knows of no legitimate reason why the patient number would change, and other patients returning to hospice care have retained the same patient numbers. Although this patient is not terminally ill, Defendant Hospice continues to provide hospice services to this patient and has fraudulently submitted claims to

Medicaid for such services.

80.     On February 27, 2005, Patient Number 00639301, a seventy-six (76) year old female, was placed on RHC care for end-stage heart disease. This patient remained on RHC for several years, and Relator visited this patient approximately August 3, 2007. During Relator's visit, Relator noted that the patient only required custodial care, had a great appetite, did not require oxygen, and complained of no pain. Despite the fact that Relator informed Defendant Hospice via her written documentation and verbal report on the patient that hospice services were not necessary, Defendant Hospice continued to provide hospice services to this patient and Defendant Hospice fraudulently submitted claims to Medicare for the hospice services provided to this patient.

81.     Patient Number 00739553 received RHC services despite the admitting RN Louis Nelson's decision that the patient "was not hospice appropriate" based in part on the patient's ability to perform all activities of daily living on her own. Relator performed the IPOC on this patient and agreed with RN Nelson that the patient did not need hospice services, based on the fact that the patient could perform all activities of daily living herself, did not require pain management, and had a Karnofsky score of 60. Defendant Cisneros overruled the RN Nelson's decision and placed this patient on RHC. Although this patient did not require hospice services for the palliation or management of symptoms caused by a terminal illness, Defendant Hospice provided such services and fraudulently submitted claims to Medicare for these services.

82.     Patient Number 00659485 was placed on RHC approximately June 14, 2005. Relator first saw this patient in July 2006. Relator's documentation on the patient stated that the patient was placed on CHC for "being incontinent of the bowel and

bladder." When Relator saw the patient, the patient was completely ambulatory and continent, had a Karnofsky score of 60, complained of no pain, and did not require assistance with any activities of daily living. Relator called and informed the team manager on call that hospice services were not necessary. Nevertheless, Defendant Hospice continued to provide hospice services and fraudulently submitted claims to Medicare for these services.

83. In approximately January 2008, Relator cared for Patient Number 00843318--7, a thirty-two (32) year old lung cancer patient Defendant Hospice had placed on RHC approximately December 2007, even though the patient had a Karnofsky scale of 90, was fully mobile as evidenced by her cleaning the house when Relator arrived, and who no longer required services for pain management. Although this patient did not require hospice services for the palliation or management of symptoms caused by a terminal illness, Defendant Hospice provided such services and fraudulently submitted claims to Medicaid for these services.

84. Relator has repeatedly objected to Defendant Hospice about patients receiving hospice services they do not need. When Relator confronted Vice-President Becker regarding the patient described supra ¶ 79 who had been receiving hospice services for four years and did not appear terminal, Vice-President Becker shrugged off her concerns responding, "You just never know how a patient is going to do when they come on service."

### Medical Supplies Not Reasonable or Medically Necessary

85. Defendant Hospice routinely orders quantities of supplies that are not reasonable given a patient's imminent death.

86.    An example of this practice occurred on or about the evening of December 15, 2007 when Patient Number 00722693, a forty-four (44) year old male, was placed on CHC with no IPOC.  Relator visited the patient on December 15, 2007, and Relator and Dr. Jane Appleby determined that the patient's death was imminent.  Dr. Appleby ordered palliative care only. The admissions nurse of Defendant Hospice ordered four (4) days of intravenous antibiotics and supplies, which are useful for cure not palliative care, to be delivered to the patient's home.  The patient passed away in the early morning of December 16, 2007, and the medications, valued at approximately $5,000, were destroyed by Relator as required by law.  Defendant Hospice fraudulently submitted a claim to Medicaid for these medical supplies which were not reasonable or medically necessary.

87.    On or about December 15, 2007, employees of Defendant Hospice disposed of large quantities of medications that had been ordered for Patient Number 00801883A, including 1,110 ML of liquid Methadone. Defendant Hospice had ordered thirty (30) days of medications, even though the patient's death was known to be imminent.  Defendant Hospice fraudulently submitted a claim to Medicaid for these medical supplies which were not reasonable or medically necessary.

### Absent or Defective IPOC

88.    Defendant Hospice, since at least the middle of April 2008 has been placing patients directly into CHC without a legally sufficient IPOC, which is required before provision of any hospice care as a precondition to payment by Medicare and Medicaid regulations.

89.    When Defendant Hospice learns of a new hospice patient, it quickly sends

a RN to the new patient to set forth a plan of care, but Defendant Hospice does not require its RNs to perform the assessment on the patient at this time. Often, a new patient is placed on CHC, and a RN is not sent to perform an assessment until twenty-four (24) to forty-eight (48) hours after a plan of care has been developed. Therefore, Defendant Hospice begins providing services before completing a legally sufficient IPOC, bills for such services, and systematically enrolls patients in hospice services where an assessment has not yet established that such services are medically necessary.

90.    Defendant Hospice particularly rushes to establish the IPOC without performing an assessment when a patient is within hours of death. In some cases, patients have died after receiving hospice services but before an assessment was ever completed, and Defendant Hospice fraudulently bills Medicare and Medicaid for these services.

91.    Patient Number 00722693, discussed supra ¶ 86, is an example of a patient which Defendant Hospice placed on CHC services without first performing an IPOC. Defendant Hospice submitted claims to Medicaid for these services. In providing these services without first completing an IPOC, Defendants failed to follow an express precondition to payment required by Medicaid.

92.    Patient Number 00883042 is another example of a patient that Defendant Hospice placed on CHC services without first performing an IPOC. Relator cared for this patient approximately June 29, 2008. Defendant Hospice submitted claims to Medicare for these services. In providing these services without first completing an IPOC, Defendants failed to follow an express precondition to payment required by Medicare.

93.    Due to Defendant Hospice's refusal to follow Medicare and Medicaid regulations requiring that a hospice provider complete an IPOC before providing hospice services, Defendants have routinely provided CHC services to patients whose conditions did not render them eligible to receive CHC services.  Often a patient may receive CHC services for days before Defendant Hospice performs an assessment which ultimately determines that CHC services are not medically necessary.  When this occurs, Defendant Hospice has provided expensive medical services to patients whose conditions did not render them eligible to receive such services, and for whom such services were not medically necessary.

94.    Patient Number 00868014 is an example of a patient who received CHC services until Defendant Hospice performed a completed IPOC that determined that the patient only required RHC services.  Relator saw this patient on or about April 12, 2008.  Defendant Hospice provided CHC services to this patient, despite the fact that the patient's condition did not meet the guidelines for such services.  Defendant Hospice submitted claims to Medicare for these services that were not medically necessary.

95.    Patient Number 00573694 is another example of a patient that received CHC services until Defendant Hospice performed a completed IPOC that determined that the patient only required RHC services.  Defendant Reed saw this patient on or about June 29, 2008.  Defendant Hospice provided CHC services to this patient, despite the fact that the patient's condition did not meet the guidelines for such services.  Defendant Hospice submitted claims to Medicaid for these services that were not medically necessary.

*Fraudulent Termination of Hospice Status*

96.     Defendant Hospice causes its RNs systematically to backdate the termination of hospice status in Defendant Hospice's records so that the hospice services appear to end prior to the incursion of costly medical services that Defendant Hospice has an obligation to cover.  By fraudulently backdating the termination of hospice status, Defendant Hospice avoids the obligation to pay monies to Medicare and Medicaid.

97.     Under both Medicare and Medicaid, hospice care providers are required on occasion to bear costs and expenses in providing such care, which exceed the per diem rate chargeable to the program.  These occasions typically arise as follows.  Medicare and Medicaid regulations permit early termination of an election period of hospice care only by the signature of the patient or a representative authorized to sign for the patient. Patients in hospice care occasionally experience situations where, despite their terminal condition, proper care requires that they be transported to an emergency room or hospital to undergo surgery or other expensive procedures.  When such care is required on an emergency basis, the hospice personnel attempt to gain the necessary signature to terminate the hospice service prior to the patient going to the emergency room or hospital, but in most cases have no time to do so.  Accordingly, the surgery and related services occur when hospice care is still in effect, so the hospice in question is required to reimburse Medicare or Medicaid (as applicable) for payments such programs make to the hospital, ambulance service and other providers giving the non-hospice services.  This is a well-understood aspect of Government hospice care programs, and a normal cost of any hospice care provider.  To avoid these costs, Defendant Hospice instructs its RNs to backdate the time of the signatures which terminate the hospice care election periods for

patients in these situations, so that they reflect that discharge from hospice occurred twenty (20) minutes prior to the ambulance ride. This backdating is a fraudulent practice which allows Defendant Hospice to avoid payments to Medicare and Medicaid for emergency care for its patients, which are legally due and payable by Defendant Hospice. Such backdating is expressly prohibited by Medicare and Medicaid rules.

98.     Relator has been instructed at least four (4) times during her employment with Defendant Hospice to retroactively date hospice services she had provided so that it appeared that hospice services ended prior to the actual time of termination of services. Each of these requests occurred when a patient required ambulance services or trips to the emergency room, which should have been paid from the per diem hospice care rate. Other RNs have told Relator that Defendant Hospice instructs them approximately eight (8) times a week to backdate the termination of services.

99.     Such an incident occurred on June 7, 2008. Team manager Defendant Reed and RN Kelly Cohn asked RN Amber Barbee to give Relator a message to backdate termination of services for Patient Number 00779957.

100.    After this incident occurred, Relator looked up regulations regarding the backdating of termination of services. Relator found a power point presentation prepared by Defendant Hospice in which the presentation states that RNs should accurately record the date and time of their services and not backdate the termination of services. Notably this shows that Defendant Hospice had actual knowledge of the rules in this regard yet flagrantly chooses to ignore them so that costs may be avoided. On June 14, 2008, Relator provided this information to other RNs she works with at Defendant Hospice, including RN Doreen Aguinaga-Knott. Just hours after receiving this information from

Relator, Defendant Reed instructed RN Aguinaga-Knott to backdate the termination of services RN Aguinaga-Knott had recently provided to Patient Number 00853766 on June 8, 2008, so that the records reflected that the services terminated one-half hour before the patient was transported via ambulance to a hospital. RN Aguinaga-Knott refused to do so, citing the information Relator had provided her. After being confronted with the information, Defendant Reed walked into her office and slammed the door.

101. All the RNs for Defendant Hospice must keep travel logs documenting the time spent traveling to the hospital. On information and belief, the travel logs of the RNs will not match up to Defendant Hospice's records of such services for those dates in which Defendant Hospice instructed the RNs to backdate the termination of their services. The dates and times on the logs, which are truthful, are evidence the hospice care was being provided to patients substantially later than the putative date and time of the termination of the hospice election period. The source of this information is Relator's comparison of her own travel log records with the hospice service records kept by Defendant Hospice, and the belief is based on the fact that Relator's own travel logs reflect the actual times of services, while the backdated records for Relator's services held by Defendants reflect the falsified time.

## HOW FACTS ABOVE CONSTITUTE VIOLATIONS OF THE FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT

102. **False Claims for CHC Services – FCA Violation:** Defendants caused Defendant Hospice to submit, and Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for CHC services provided to patients whose conditions did not meet CHC guidelines and where such services were not medically necessary. Medicare and Medicaid only pay for those hospice items or services which are

"reasonable and necessary for the palliation or management of terminal illness."
Moreover, Medicare and Medicaid direct that hospice providers provide CHC services
only for those patients experiencing periods of crisis, or only as necessary to maintain a
terminally ill patient at home. However, Defendants provided CHC services to patients
that did not require such a high level of care, and where RHC services, custodial services,
or in some cases, no services at all were necessary. These patients were not experiencing
periods of crisis, and CHC was not necessary to maintain these patients at their homes.
Consequently, these services were not medically necessary. Therefore, the claims for
these services constitute false claims for payment from the Medicare and Medicaid
programs.

103. **False Claims for Hospice Services Generally; Only Custodial Care
Needed – FCA Violation:** Defendants caused Defendant Hospice to submit, and
Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for
hospice services provided to patients whose conditions did not require hospice services.
Medicare and Medicaid pay only for those hospice items or services which are
"reasonable and necessary for the palliation or management of terminal illness."
However, Defendants provided hospice services to patients that only needed custodial
services or no services at all. As these patients did not require hospice services, these
services were not medically necessary. Therefore, these claims constitute false claims for
payment from the Medicare and Medicaid programs.

104. **False Claims for Hospice Services Generally; Patients Not Terminally
Ill – FCA Violation:** Defendants made or caused to be made false statements on the
certifications for terminal illness in order to provide and submit claims for hospice

services provided to patients who were not terminally ill. Medicare and Medicaid pay only for those hospice items or services which are "reasonable and necessary for the palliation or management of terminal illness." As Defendants made false statements regarding the terminal status of certain patients, and these patients were not terminally ill, these services were not medically necessary. Therefore, these claims constitute false claims for payment from the Medicare and Medicaid programs.

105. **False Claims for Unreasonable Amounts of Medical Supplies – FCA Violation:** Defendants caused Defendant Hospice to submit, and Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for medical supplies that were not reasonable or medically necessary. Medicare and Medicaid pay only for those hospice items or services which are "reasonable and necessary for the palliation or management of terminal illness." The ordering of large quantities of medical supplies for a patient whose death is known to be imminent is not reasonable, nor are such supplies medically necessary. However, Defendant Hospice routinely ordered large quantities of medical supplies for individuals whose deaths were known to be imminent. These supplies were not reasonable or medically necessary. Therefore, the claims for these services constitute false claims for payment from the Medicare and Medicaid programs.

106. **Absent or Defective IPOC – FCA Violation:** Defendants caused Defendant Hospice to submit, and Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for hospice services where such services did not fulfill legally required prerequisites to reimbursement. An IPOC must be established before services are provided, and the IPOC must include an assessment of the patient's needs. Defendant Hospice prescribed plans of care and placed patients on particular levels of

hospice without first assessing the patients' needs for such care. Consequently, Defendant Hospice did not fulfill the legally required steps for submitting a claim for these services. Therefore, these claims constitute false claims for payment from the Medicare and Medicaid programs.

107. **Absent or Defective IPOC – Patient Ineligible – FCA Violation:** Defendants caused Defendant Hospice to submit, and Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for hospice services where such services were not medically necessary, and the provision of the services that were not medically necessary was due to the Defendants' failure to perform a legally sufficient IPOC before rendering services. An IPOC must be established before services are provided, and the IPOC must include an assessment of the patient's needs. Defendant Hospice prescribed plans of care and placed patients on particular levels of hospice without first assessing the patients' needs for such levels of care. As these assessments determine the medical necessity of the hospice services, the lack of such assessments resulted in certain patients receiving higher levels of care than what their medical situations required, and Medicare and Medicaid paid for services which were not medically necessary. These services were not medically necessary. Therefore, the claims for these services constitute false claims for payment from the Medicare and Medicaid programs.

108. **Fraudulent Termination of Hospice Status – FCA Violation:** Defendants routinely submitted claims for hospice services with false representations of the time of the termination of those services in order to avoid incurring obligations to pay money to the United States Government. By taking part in the Medicare and Medicaid

programs, Defendants agreed to accept the set per diem rate for hospice services, regardless of the actual cost of services required for the patient. Thus, Defendant Hospice was legally liable for the medical costs of hospice patients while the patients retained hospice status. However, Defendants routinely backdated the time of termination of hospice services when patients required hospital visits. In backdating the termination of hospice status, Defendant Hospice fraudulently avoided the incursion of these costs, and Medicare and Medicaid instead paid costs that should have been borne by Defendant Hospice.

109. **Changing Patient Identification Number; Patients Not Terminal – FCA Violation:** Defendants caused Defendant Hospice to submit, and Defendant Hospice submitted, claims for Medicare and Medicaid reimbursement for hospice services where such claims stated patient identification numbers that Defendants had changed to conceal the continuing provision of hospice services to patients that were not terminal. Defendants concealed the patients' actual identification numbers to prevent Medicare and Medicaid from discovering the lengthy periods Defendant Hospice had provided hospice services to these patients. As such, the claims for these services were false claims for payment from the Medicare and Medicaid programs.

110. **Conspiracy – FCA Violation:** Defendants agreed with each other systematically to conceal from Medicare and Medicaid agreements and policies which constitute conspiracies to defraud the United States and the State of Texas by the filing of false and fraudulent claims. Defendants have also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced payments or resulted in repayments to Medicare and Medicaid. Defendants have taken steps in furtherance of

38

this conspiracy, inter alia, causing such false claims to be prepared and submitted. The United States and the State of Texas and their fiscal intermediaries were unaware of Defendants' conspiracy and the falsity of the records, statements, and claims made by Defendants and their agents. Medicare and Medicaid therefore paid and continue to pay reimbursements that they would not otherwise have paid, as intended by Defendants.

111. **False Claims for CHC Services Where Beneficiaries Were Never Eligible – TMFPA Violation:** Defendants systematically made misrepresentations of material facts regarding patients' eligibility for CHC services. In order to be eligible for CHC services, those patients receiving CHC should have been experiencing a "sudden paroxysmal intensification of symptoms" that required skilled nursing care for palliation and management of the symptoms. However, Defendants provided CHC services to patients that did not require such a high level of care, and where RHC services, custodial services, or in some cases, no services at all were necessary. These patients were not experiencing periods of crisis, and CHC was not necessary to maintain these patients at their homes. Therefore, these patients were not eligible for such services, and Defendants' claims to Medicaid for these services constitute false claims for payment from the Medicaid program.

112. **False Claims for CHC Services Where Beneficiaries Became Ineligible – TMFPA Violation:** Defendants systematically concealed or failed to disclose facts affecting patients' continued eligibility for CHC services. In order to remain eligible for CHC services, those patients receiving CHC should have been experiencing a continuation of a "sudden paroxysmal intensification of symptoms" that required skilled nursing care for palliation and management of the symptoms. While certain patients may

Case 4:13-cv-00563-BCW   Document 1   Filed 08/08/08   Page 39 of 56

at first have been eligible for CHC services, Defendant Hospice kept many patients on CHC services even after the crisis subsided, CHC was not required to maintain the patient at home, and the patients' palliation and management of symptoms were under control by means that did not require CHC services. These patients became ineligible for CHC services, and Defendants' claims to Medicaid for these services constitute false claims for payment from the Medicaid program.

113. **False Claims for Hospice Services Generally Where Beneficiaries Were Never Eligible – TMFPA Violation:** Defendants systematically made misrepresentations of material facts regarding patients' eligibility for hospice services. In order to be eligible for hospice services, patients must be terminally ill and require hospice items or services which are "reasonable and necessary for the palliation or management of terminal illness." However, Defendants provided hospice services to patients who were not terminally ill or who only required custodial care or less. These patients were not eligible to receive hospice services, and Defendants' claims to Medicaid for these services constitute false claims for payment from the Medicaid program.

114. **False Claims for Hospice Services Generally Where Beneficiaries Became Ineligible – TMFPA Violation:** Defendants systematically concealed or failed to disclose facts affecting patients' continued eligibility for hospice services. In order to remain eligible for hospice services, those patients receiving hospice services should have been terminally ill or required medical care necessary for the palliation and management of symptoms caused by a terminal illness. While certain patients may at first have been eligible for hospice services, Defendant Hospice kept many patients on hospice services

even after health status changes showed that patients were not terminally ill, as defined by Medicaid, or after the patients' management of symptoms was under control and the patients no longer required hospice services. These patients became ineligible for hospice services, and Defendants' claims for these services constitute false claims for payment from the Medicaid program.

115. **False Claims for Unreasonable Amounts of Medical Supplies – TMFPA Violation:** Defendants systematically concealed or failed to disclose facts regarding the imminent nature of certain patients' deaths when submitting claims for medical supplies. Consequently, Defendants routinely ordered and submitted claims to Medicaid for large quantities of medical supplies that were neither reasonable nor medically necessary, as required by law, for patients whose deaths were known to be imminent. These patients' conditions rendered them ineligible for such supplies, and Defendants' claims for these supplies constitute false claims for payment from the Medicaid program.

116. **Absent or Defective IPOC – TMFPA Violation:** Defendants systematically made or caused to be made false statements or misrepresentations claiming that it had performed legally sufficient IPOCs before placing patients on hospice services. Medicaid regulations require that an IPOC must be established before services are provided, and the IPOC must include an assessment of the patient's needs. In some cases, Defendant Hospice prescribed plans of care and placed patients on particular levels of hospice without first assessing the patients' needs for those hospice services. In other cases, Defendant Hospice failed to perform any IPOC at all. Consequently, Defendant Hospice did not fulfill the legally required steps necessary for submitting a claim for

these services, and therefore Defendants' claims for these services constitute false claims for payment from the Medicaid program.

117. **Absent or Defective IPOC – Patient Ineligible – TMFPA Violation:** Defendants systematically made or caused to be made false statements or misrepresentations claiming Defendants had performed legally sufficient IPOCs before placing patients on hospice services, and which resulted in patients receiving hospice services in which they were not eligible. Medicaid regulations required that an IPOC be established before services are provided, and the IPOC must include an assessment of the patient's needs. Defendant Hospice prescribed plans of care and placed patients on particular levels of hospice without first assessing the patients' needs for those hospice services. As these assessments determine the medical necessity and eligibility of patients to receive hospice services, the lack of such assessments resulted in certain patients receiving higher levels of care than what their medical situations required. Therefore, Defendants' claims for these services constitute false claims for payment from the Medicaid programs.

118. **Fraudulent Termination of Hospice Status by Concealing or Failing to Disclose Material Facts – TMFPA Violation:** Defendants routinely concealed the time of the termination of hospice status, which Defendants knew affected patients' continued rights to services provided by Defendant Hospice. When a patient required costly medical expenses, Defendants fraudulently stated that hospice services terminated before the actual time of termination, thereby avoiding the incursion of costly medical services. By taking part in the Medicaid program, Defendants agreed to accept the set per diem rate for hospice services, regardless of the actual cost of services required for the patient.

42

Thus, Defendant Hospice was legally liable for the medical costs of hospice patients while the patients retained hospice status. In backdating the termination of hospice status, Defendant Hospice concealed events that affected patients' continued rights to benefits and fraudulently avoided the incursion of costs that should have been borne by Defendant Hospice rather than by Medicaid.

119. **Fraudulent Termination of Hospice Status by False Statements or Misrepresentations – TMFPA Violation:** Defendants routinely made or caused to be made false statements regarding the hospice status of patients, and intended these false statements to be used to determine a patients' continued eligibility for benefits. By taking part in the Medicaid program, Defendants agreed to accept the set per diem rate for hospice services, regardless of the actual cost of services required for the patient. Thus, Defendant Hospice was legally liable for the medical costs of hospice patients while the patients retained hospice status. In backdating the termination of hospice status, Defendant Hospice fraudulently stated the termination of the hospice status of certain patients, affecting those patients' eligibility for hospice services, and avoiding the incursion of costs that should have been borne by Defendant Hospice rather than by Medicaid.

120. **Changing Patient Identification Number; Patients Ineligible for Hospice Services – TMFPA Violation:** By changing patient identification numbers, Defendants knowingly or intentionally concealed the continuing provision of hospice services to patients that were not terminal. Defendants concealed the patients' actual identification numbers to prevent Medicaid from discovering the lengthy periods Defendant Hospice had provided hospice services to these patients. Thus, Defendant

Hospice concealed facts that affected patients' continued rights to hospice services, thereby submitting false claims for payment from the Medicaid program.

121. **Conspiracy – TMFPA Violation:** Defendants agreed with each other systematically to conceal from Medicaid agreements and policies which constitute conspiracies to defraud the United States and the State of Texas by the filing of false and fraudulent claims. Defendants have also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced payments or resulted in repayments to Medicaid. Defendants have taken steps in furtherance of this conspiracy, inter alia, causing such false claims to be prepared and submitted. The United States and the State of Texas and their fiscal intermediaries were unaware of Defendants' conspiracy and the falsity of the records, statements, and claims made by Defendants and their agents. As a result thereof, Medicaid has paid and continues to pay reimbursements that it would not otherwise have paid, as intended by Defendants.

### DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT: COUNTS

### COUNT I

**31 U.S.C. § 3729(a)(1)**
**All Defendants**
**False Claims for CHC Services**

122. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

123. Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for CHC services, which claims were false and fraudulent because the services were not medically necessary, thereby causing

damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

## COUNT II

### 31 U.S.C. § 3729(a)(1)
### All Defendants
### False Claims for Hospice Services Generally; Only Custodial Care Needed

124.  Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

125.  Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for hospice services, which claims were false and fraudulent because the services were not medically necessary, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

## COUNT III

### 31 U.S.C. § 3729(a)(2)
### All Defendants
### False Claims for Hospice Services Generally; Patients Not Terminally Ill

126.  Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

127.  Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made, used, and/or caused to be made or used false statements required for payment in U.S. Government hospice programs, including the certifications of terminal illness, in order to cause the United States Government to pay for hospice services supplied by Defendant, which statements were false because such services were

not medically necessary, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(2).

## COUNT IV

### 31 U.S.C. § 3729(a)(1)
### All Defendants
### False Claims for Unreasonable Amounts of Medical Supplies

128.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

129.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for medical supplies, which claims were false and fraudulent because the supplies were not reasonable or medically necessary, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

## COUNT V

### 31 U.S.C. § 3729(a)(1)
### All Defendants
### Absent or Defective IPOC

130.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

131.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for hospice services, which claims were false and fraudulent because Defendant Hospice did not first perform legally sufficient IPOCs as Medicare and Medicaid mandate as a prerequisite to payment, thereby causing

damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

## COUNT VI

### 31 U.S.C. § 3729(a)(1)
### All Defendants
### Absent or Defective IPOC – Patient Ineligible

132.   Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

133.   Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for medical services, which claims were false and fraudulent because Defendant Hospice did not first perform legally sufficient IPOCS as Medicare and Medicaid mandate as a prerequisite to payment, resulting in patients receiving services that were not medically necessary, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

## COUNT VII

### 31 U.S.C. § 3729(a)(7)
### Defendant Hospice and Defendant Reed
### Fraudulent Termination of Hospice Status

134.   Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

135.   Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made or used or caused to be made or used false statements, which statements were false and fraudulent because Defendant Hospice knowingly

misstated the time of termination of hospice services to agents of the United States Government in order to avoid incurring obligations to pay money to the United States Government, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(7), the FALSE CLAIMS ACT.

### COUNT VIII

**31 U.S.C. § 3729(a)(1)**
**All Defendants**
**Changing Patient Identification Number; Patients Not Terminal**

136.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

137.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly presented or caused to be presented to agents of the United States Government claims in order to obtain payment for medical services, which claims were false and fraudulent because Defendants had changed patient identification numbers to conceal the fact that the same patients had received hospice services previously, thereby causing damage to the United States Treasury in violation of 31 U.S.C. § 3729(a)(1), the FALSE CLAIMS ACT.

### COUNT IX

**31 U.S.C. § 3729(a)(3)**
**All Defendants**
**Conspiracy**

138.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

139.    Through the acts described above and otherwise, Defendants and their agents each entered into a conspiracy with each other to defraud the United States by

submitting false or fraudulent claims for payment. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged by the loss of Medicare and Medicaid funds in violation of 31 U.S.C. § 3729(a)(3).

## COUNT X

### TEX. HUM. RES. CODE ANN. § 36.002(1)(B)
### All Defendants
### False Claims for CHC Services Where Beneficiaries Were Never Eligible

140. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

141. Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made or caused to be made false statements or misrepresentations of material facts to agents of the State of Texas, which statements were used to determine the eligibility of patients for CHC hospice services under the Medicaid program, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(1)(B).

## COUNT XI

### TEX. HUM. RES. CODE ANN. § 36.002(2)(A)
### All Defendants
### False Claims for CHC Services Where Beneficiaries Became Ineligible

142. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

143. Through the acts described above and otherwise, Defendant Hospice and their agents knowingly concealed or failed to disclose events which Defendants knew affected patients' continued rights to CHC services under the Medicaid program in order

to cause the State of Texas to pay for CHC services supplied by Defendant, which services were not medically necessary, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(2)(A).

### COUNT XII

**TEX. HUM. RES. CODE ANN. § 36.002(1)(B)**
**All Defendants**
**False Claims for Hospice Services**
**Generally Where Beneficiaries Were Never Eligible**

144.  Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

145.  Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made or caused to be made false statements or misrepresentations of material facts to agents of the State of Texas, which statements were used to determine the eligibility of patients for hospice services under the Medicaid program, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(1)(B).

### COUNT XIII

**TEX. HUM. RES. CODE ANN. § 36.002(2)(A)**
**All Defendants**
**False Claims for Hospice Services Generally Where Beneficiaries Became Ineligible**

146.  Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

147.  Through the acts described above and otherwise, Defendant Hospice and their agents knowingly concealed or failed to disclose events which Defendants knew affected patients' continued rights to hospice services under the Medicaid program in order to cause the State of Texas to pay for hospice services supplied by Defendant,

which services were not medically necessary, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(2)(A).

## COUNT XIV

### TEX. HUM. RES. CODE ANN. § 36.002(2)(A)
### All Defendants
### False Claims for Unreasonable Amounts of Medical Supplies

148.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

149.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly concealed or failed to disclose events to agents of the State of Texas when submitting claims for large quantities of medical supplies which would have revealed the imminent status of certain patients' deaths, and which Defendants knew affected the patients' rights to such benefits, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(2)(A).

## COUNT XV

### TEX. HUM. RES. CODE ANN. § 36.002(1)(B)
### All Defendants
### Absent or Defective IPOC

150.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

151.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made or caused to be made false statements or misrepresentations of material facts to agents of the State of Texas, which statements claimed that Defendants had performed legally sufficient IPOCs, when in fact Defendants had not performed IPOCs or had performed defective IPOCS, and which Defendants knew

51

affected patients' eligibility to receive hospice services, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(1)(B).

## COUNT XVI

### TEX. HUM. RES. CODE ANN. § 36.002(1)(B)
### All Defendants
### Absent or Defective IPOC – Patient Ineligible

152.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

153.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly made or caused to be made false statements or misrepresentations of material facts to agents of the State of Texas, which statements claimed that Defendants had performed legally sufficient IPOCs, when in fact Defendants had not performed IPOCs or had performed defective IPOCs, and which Defendants knew affected patients' eligibility to receive hospice services.  As a result, certain patients received hospice services in which their conditions did not render them eligible, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(1)(B).

## COUNT XVII

### TEX. HUM. RES. CODE ANN. § 36.002(2)(A)(i)
### Defendant Hospice and Defendant Reed
### Fraudulent Termination of Hospice Status by
### Concealing or Failing to Disclose Material Facts

154.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

155.    Through the acts described above and otherwise, Defendant Hospice and their agents knowingly concealed or failed to disclose events regarding the actual time of

termination of hospice status for certain patients, which affected the continued rights to

benefits or payments under the Medicaid program, thereby causing damage to the State of

Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(2)(A)(i).

## COUNT XVIII

**TEX. HUM. RES. CODE ANN. § 36.002(1)(B)**
**Defendant Hospice and Defendant Reed**
**Fraudulent Termination of Hospice Status**
**by False Statements or Misrepresentations**

156.     Plaintiff re-alleges and incorporates the allegations contained in

paragraphs 1 through 101 as if fully set forth herein.

157.     Through the acts described above and otherwise, Defendant Hospice and

their agents knowingly made or caused to be made false statements or misrepresentations

of material facts to agents of the State of Texas regarding the time of termination of

hospice services, which statements were used to determine patients' eligibility for

hospice benefits, and which Defendants falsely represented to avoid obligations to pay

money to the State of Texas, thereby causing damage to the State of Texas in violation of

TEX. HUM. RES. CODE ANN. § 36.002(1)(B).

## COUNT XIX

**TEX. HUM. RES. CODE ANN. § 36.002(2)(A)**
**All Defendants**
**Changing Patient Identification Number; Patients Ineligible for Hospice Services**

158.     Plaintiffs re-allege and incorporate the allegations contained in

paragraphs 1 through 101 as if fully set forth herein.

159.     Through the acts described above and otherwise, Defendant Hospice and

their agents knowingly or intentionally concealed or failed to disclose patient

identification numbers in order to conceal the fact that the same patients had received

hospice services previously and that the patients were not terminal, which Defendants knew affected the continued right to hospice benefits under the Medicaid program, thereby causing damage to the State of Texas in violation of TEX. HUM. RES. CODE ANN. § 36.002(2)(A).

## COUNT XX

### TEX. HUM. RES. CODE ANN. § 36.002(9)
### All Defendants
### Conspiracy

160. Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

161. Through the acts described above and otherwise, Defendants and their agents knowingly or intentionally entered into a conspiracy with each other to defraud the State of Texas by submitting false or fraudulent claims for Medicaid payment. Defendants have also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced Medicaid payments or resulted in repayments to Medicaid. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the State of Texas has been damaged by the loss of Medicaid funds in violation of TEX. HUM. RES. CODE ANN. § 36.002(9).

### PRAYER FOR RELIEF

Relator demands judgment against Defendants and each of them as follows:

a. That by reason of the violations of the FCA, this Court enter judgment against Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more

than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That Relator, as a *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the FCA and/or any other applicable provision of law;

c. That by reason of the violations of the TMFPA, this Court enter judgment against Defendants in an amount equal to two (2) times the amount of damages the State of Texas has sustained because of Defendant's actions, with interest, plus a civil penalty of not less than Five Thousand Dollars ($5,000) and not more than Ten Thousand Dollars ($10,000) for each violation of the TMFPA. TEX. HUM. RES. CODE ANN. § 36.052;

d. That Relator, as a *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to TMFPA and/or any other applicable provision of law;

e. That Relator be awarded all costs of this action, including attorney's fees and court costs;

f. That Relator be granted a trial by jury; and

g. That Relator have such other relief as the Court deems just and proper.

55

Dated: August 7, 2008

Respectfully submitted,

*Rebecca Reed*

Rebecca Reed
Texas Bar No.  00784824
LILES PARKER PLLC
101 Stumberg
San Antonio, TX 78204
(210) 225-0900
(202) 337-5804 (fax)
rreed@lilesparker.com
Attorney for Relator


*Robert W. Liles*

Robert W. Liles
Texas Bar No.  00786061
LILES PARKER PLLC
4400 MacArthur Boulevard, NW
Suite 203
Washington, D.C. 20007
(202) 298-8750
(202) 337-5804 (fax)
rliles@lilesparker.com
Attorney for Relator

56